**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------------x

| | |
|---|---|
| BS SUN SHIPPING MONROVIA, : | |
| : | |
| Petitioner-Counter-Defendant-Defendant-In-Intervention, : | |
| : | **06 Civ. 839 (HB)** |
| - against - : | |
| : | **OPINION &** |
| : | **ORDER** |
| CITGO PETROLEUM CORPORATION, : | |
| : | |
| Respondent-Counter-Claimant-Defendant-In-Intervention, : | |
| : | |
| - and - : | |
| : | |
| PILOT ENTERPRISES INC., : | |
| : | |
| Intervenor-Plaintiff. : | |

-------------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

Petitioner-Counter-Defendant-Defendant-In-Intervention BS Sun Shipping
Monrovia ("BS Sun") brought this action seeking a declaratory judgment and stay of
arbitration against Respondent-Counter-Claimant-Defendant-In-Intervention Citgo
Petroleum Corporation ("Citgo").

Third-party Intervenor-Plaintiff Pilot Enterprises, Inc. ("Pilot") now moves to
intervene in the action. Citgo moves to compel Pilot to arbitrate. Citgo renews its
motion to compel BS Sun to arbitrate, while BS Sun cross-moves in support of its
original petition to stay arbitration by Citgo against BS Sun. BS Sun moves to dismiss
Citgo's counterclaim against BS Sun as time-barred, while Citgo cross-moves to strike
BS Sun's affirmative defense that Citgo's counterclaim is time-barred.

For the reasons articulated in more detail below, Pilot's motion to intervene in this
action is GRANTED. Citgo's motion to compel Pilot to arbitrate is GRANTED. Citgo's
motion to compel BS Sun to arbitrate is DENIED (and conversely, BS Sun's petition to
stay arbitration is GRANTED). BS Sun's motion to dismiss Citgo's counterclaim against
BS Sun is GRANTED (and conversely, Citgo's cross-motion to strike BS Sun's
affirmative defense is DENIED).

## I.        BACKGROUND

A. The BS Sun-Pilot "Time Charter" Contract

BS Sun Shipping Monrovia ("BS Sun") was the owner of the "M/V STINICE" (hereinafter, the "STINICE" or the "vessel"),[1] a commercial tanker which is the ship and its cargo at issue in this litigation. See Rule 56.1 Declaration of Garth Wolfson, Apr. 11, 2007 ("Wolfson 56.1 Decl."), ¶ 6. On April 4, 2002, BS Sun entered into a "time charter party" (hereinafter, the "time charter") with Pilot Enterprises Inc. ("Pilot").[2] See Wolfson 56.1 Decl., ¶ 7, Ex. A(2). Pilot alleges, and it does not appear to be disputed, that Pilot thus became the "time-chartered owner" or "disponent owner" of the STINICE. See Pilot Verified Complaint-in-Intervention, Mar. 9, 2007 ("Pilot Compl.") ¶ 6, attached to Pilot's Motion for Leave to Intervene, Mar. 9, 2007, Ex. A.

Under the time charter, Pilot chartered the STINICE for two years, renewable at Pilot's option for up to two additional twelve-month periods. See Wolfson 56.1 Decl., ¶ 7, Ex. A(2). BS Sun and Pilot subsequently extended the time charter beyond the original two-year period for an additional year. See Deposition of Zlatko Kabic, October 13, 2006 ("Kabic Depo."), at 47-53, attached at Wolfson 56.1 Decl., ¶ 7, Ex. E; Reply Declaration of Garth Wolfson, April 30, 2007 ("Wolfson Reply Decl."), Ex. I (extension of time charter).[3] The BS Sun-Pilot time charter provided for English jurisdiction over disputes arising thereunder, and allowed either party to elect arbitration before a single arbitrator in London. See Wolfson 56.1 Decl., Ex. A(2).

B. The Pilot-Citgo "Voyage Charter" Contract

On November 23, 2004, Chris Vasilas ("Vasilas"), a broker with Elka Ship Brokerage & Trading ("Elka"), tendered an offer by email for a "voyage charter party" contract (hereinafter, the "voyage charter") to Kevin Conway ("Conway"), a broker with

---

[1] Pilot, pursuant to an option in its contract with BS Sun, eventually purchased the STINICE from BS Sun on or about March 13, 2005. See Pilot Verified Complaint-in-Intervention, Mar. 9, 2007 ("Pilot Compl.") ¶ 15, attached to Pilot's Motion for Leave to Intervene, Mar. 9, 2007, Ex. A.

[2] A time charter constitutes a contract under which "the charterer engages for a fixed period of time a vessel, which remains manned and navigated by the vessel owner, to carry cargo wherever the charterer instructs." See U. S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd., 241 F.3d 135, 138 n.2 (2d Cir. 2001), citing 2 Thomas J. Schoenbaum, Admiralty and Maritime Law § 11-1, at 169 (2d ed. 1994). Here, Pilot is the "charterer" and BS Sun is the "vessel owner."

[3] This factual issue was unclear upon Citgo's original motion to dismiss BS Sun's petition. See BS Sun Shipping Monrovia v. Citgo Petroleum Corp., 2006 U.S. Dist. LEXIS 54588, at *2 n.3 (S.D.N.Y. Aug. 8, 2006).

Islandia Chartering, Inc. ("Islandia").[4]  See Declaration of Christopher M. Panagos, Apr. 11, 2007 ("Panagos Decl."), Ex. D, at ELKA 000002-6.  Vasilas testified that "Pilot was [his] client," and indeed, Pilot freely admits that Vasilas negotiated the "voyage charter" on behalf of Pilot.  See Deposition of Chris Vasilas, Nov. 16, 2006 ("Vasilas Depo.") at 11, 13, attached at Panagos Decl. Ex. C; see also Pilot's Motion in Opposition… to Citgo's Motion to Compel Arbitration ("Pilot. Mem. Opp.") at 2.  Vasilas' email offer, under the heading "Owner's Mailing Address," listed the address of "European Product Carriers" ("EPC") and also listed Elka, Elka's phone number, and Vasilas as a "contact."  Panagos Decl., Ex. D, at ELKA 000003.  EPC, according to Citgo and undisputed by Pilot, is a corporate alter ego of Pilot.[5]  Vasilas' email offer included the notation "GA/ARB NYK US LAW."  Panagos Decl., Ex. D, at ELKA 000003.

Conway passed Vasilas' email along to Rita Cipriano, another Islandia broker, who was representing Citgo.  Deposition of Rita Cipriano, Oct. 11, 2006 ("Cipriano Depo.") at 9-10, attached at Panagos Decl. Ex. B.  Cipriano testified that "GA/ARB NYK US LAW" was understood in the industry to mean "General average arbitration, New York, United States law."  Cipriano Depo. at 13, at Panagos Decl. Ex. B.

Later that day, November 23, 2004, Vasilas emailed Conway and told him, in response to Conway's questions, that the "owners" of the vessel were "BS Sun Shipping Monrovia Liberia."  Panagos Decl., Ex. D, at ELKA 000012; see also Vasilas Depo. at 30.  Shortly afterwards, Cipriano circulated a "preliminary recap" to Conway and a Citgo representative that listed "BS Sun" as the "owners" of the vessel (but listed under "owners' addresses" EPC's and Elka's addresses).  Panagos Decl., Ex. E, at I 000251-56.  At 6 PM that night, Vasilas emailed Conway a "Q88" form listing the ship's particulars, which listed the "owners" as BS Sun, and the "disponent owners" as "N/A."  See Panagos Decl. Ex. B, at ELKA000018.  Vasilas later testified that the line "disponent owners" should have read "Pilot Enterprises," and that that omission was a "mistake."  Vasilas Depo. at 129.

---

[4] Vasilas testified that this was the first time he had negotiated a charter party on behalf of the STINICE.  See Vasilas Depo. at 24, at Panagos Decl., Ex. C.

[5] Vasilas described EPC as Elka's "designate for communications."  See Vasilas Depo. at 82, at Panagos Decl., Ex. C.

Vasilas testified that this Q88 information is "typically prepared by the owners," but in this case, he could not remember whether the information came from Elka, Pilot, BS Sun, or somebody else.  Vasilas Depo. at 33-34.  Vasilas testified generally, though, that his contact at Pilot was "Nick Karandinos."  Vasilas Depo. at 24-25.  Karandinos (hereinafter "Capt. Karandinos") declares that he was the "vessel operator" of the STINICE at this time, and that his responsibilities included "working with brokers for the negotiation of voyage charter parties on behalf of Pilot Enterprises for the carriage of cargo," and that he specifically assisted Vasilas with the negotiation of the Citgo-Pilot voyage charter.  Affidavit of Capt. N. Karandinos, Apr. 23, 2007 ("Karandinos Aff.") at ¶ 2-4, at Declaration of George M. Chalos, Apr. 24, 2007 ("Chalos Decl.") Ex. C.[6]  Captain Karandinos avers that to the best of his knowledge, no "alternative dispute resolution" was discussed in the negotiations prior to the voyage charter agreement, nor did Karandinos provide Vasilas with authority to agree on behalf of Pilot to an "alternative dispute resolution clause."  Karandinos Aff. at ¶ 6-8.

The next day, November 24, 2004, Conway emailed Vasilas a "Final Recapitulation" of the terms of the voyage charter (hereinafter, the "fixture recap").  See Panagos Decl., Ex. D, at ELKA 000031-35.  This "fixture recap" essentially codifies that Pilot would transport oil for Citgo via the STINICE from St. Croix, U.S. Virgin Islands, to New Jersey.[7]  Id.  The fixture recap included the same "GA/ARB NYK US LAW" notation that provided for arbitration of any disputes arising thereunder in New York.[8]  Id.  The fixture recap stated at the top, "[T]he following terms and conditions have been agreed between BS Sun Shipping… as owners and Citgo… as charterers."  Id.  Vasilas, however, testified that that statement was wrong.  Vasilas Depo. at 88, 111-12, at Wolfson Decl., Ex. H ("Pilot is the owner within the context of the voyage charter…

---

[6] Citgo moves to strike Captain Karandinos' affidavit as failing to meet the authentication requirements for a foreign affidavit as set forth by Fed. R. Evid. 902(3).  See Section III.B, infra.

[7] See, e.g., Cipriano Depo. at 24 ("Q: This final recap basically was the contract between the parties? A: Yes sir.").

[8] The fixture recap also incorporated "ASBATANKVOY" form charter party terms.  See Panagos Decl., Ex. D, at ELKA 000031-35.  Clause 24 of the ASBATANKVOY form provides for arbitration in either London or New York depending upon the parties' election.  See Petition for Declaratory Judgment and Stay of Arbitration, Jan. 27, 2006 ("BS Sun Pet."), Ex. A (ASBATANKVOY form).  The fixture recap, as noted, contained the provision "GA/ARB NYK US LAW," thus indicating arbitration in New York under U.S. law.

[T]he agreement isn't between BS Sun. It should be between Pilot Enterprises and Citgo Petroleum.")[9]

The fixture recap, as did the prior documents, listed BS Sun as the vessel's "owner[]."  See Panagos Decl., Ex. D, at ELKA 000031.  Again, however, under "Owner's Mailing Address/Phone/Etc." the fixture recap lists contact information for EPC and Elka rather than for BS Sun.  Id. at ELKA 000032.  The fixture recap also provides for payment by Citgo to a bank account in Pilot's name.  Id.

On December 3, 2004, Citgo emailed Islandia, stated that in accordance with "Adminstration Clause 32,"[10] Citgo confirmed agreement to the terms of the fixture recap dated November 24, and asked to "pass the following to vessel owners."  Panagos Decl., Ex. D, at ELKA000039.  Islandia forwarded the message to Vasilas and asked to "confirm safe receipt and send owner's agreement."  Id.  It does not appear that Vasilas responded.  Generally, however, it does not appear that Vasilas or Elka objected to the terms of the fixture recap subsequent to its circulation among the parties.[11]

Vasilas testified that he had no correspondence with BS Sun at the time of the negotiations, and that nothing in his file indicated that BS Sun was made aware of the terms of the voyage charter generally, or the arbitration provision specifically.  Vasilas Depo. at 92, at Wolfson 56.1 Declaration Ex. H.  Vasilas additionally testified that there existed no agency agreement between Elka and BS Sun.  Id.  Zlatko Kabic, BS Sun's former secretary, also attested that "neither Pilot nor Elka have ever acted as broker or agent for" BS Sun, and that BS Sun never entered into any voyage charter with Citgo.  Declaration of Zlatko Kabic, Mar. 27, 2006 ("Kabic Decl.") ¶ 7, at Wolfson 56.1 Decl. Ex. A.

---

[9] Vasilas continued, "Owners should have been clarified here as I guess registered owners and then either time charterers or disponent owner should have been put in as Pilot Enterprises."  Vasilas Depo. at 111-12.

[10] Citgo represents that "Administration Clause 32" of the "ASBATANKVOY" form provides a process by which the parties could avoid the need for a formal, signed charter party.  See Citgo Memorandum of Law ("Citgo Mem.") at 5.  The "ASBATANKVOY" form provided by BS Sun with its original petition does not include an "Administration Clause 32," nor a 32nd paragraph generally.  See BS Sun Pet., Ex. A.  (That "ASBATANKVOY" form is followed by a rider, but the 32nd paragraph of that rider does not appear to refer to any process by which the parties might avoid the need for a formal, signed charter party.  Id.)  Accordingly, it does not appear at this point that Citgo has provided this  "Administration Clause 32" clause to the Court.

[11] See, e.g., Cipriano Depo. at 23 ("Q: To your knowledge, did Elka ever respond… saying now, wait a minute, there's a problem here, the owner is incorrectly identified? A: No, sir.").

C.  Damage to Cargo and Subsequent Actions

On December 15, 2004, according to the bill of lading signed by the vessel's master, Captain Roberto Malinka,[12] the STINICE was loaded with Citgo's oil at St. Croix, U.S. Virgin Islands, and sailed for Linden, New Jersey pursuant to the terms of the voyage charter.  See Wolfson 56.1 Decl., Ex. A(1)(B).  Upon discharge at New Jersey on December 20, 2004, Citgo alleged that the cargo was contaminated.  See Citgo Answer and Counterclaim, Aug. 30, 2006 ("Citgo Answer"), ¶ 25.

On December 21, 2004, Islandia, at Citgo's behest, emailed Vasilas and put him on notice of the potential contamination.  Panagos Decl., Ex. E at I000137.  Vasilas shortly thereafter notified Captain Karandinos at Pilot.  Panagos Decl., Ex. D at ELKA000068.

Vasilas testified that, although it does not appear he notified BS Sun, a representative of the vessel's Protection & Indemnity ("P&I") underwriters visited the STINICE around this time.  Vasilas Depo. at 64, at Panagos Decl. Ex. C.  Citgo has also produced an email from "M.V. Stinice Email," signed by "Capt. Robert M," notifying Captain Glen Drummond of "Anglo Eastern Group" of the contamination on December 22, 2004.  Panagos Decl. Ex. G.  Citgo also proffers a "Lloyd's Register of Ships 2004-2005" that lists BS Sun Shipping as responsible for the STINICE, and "Anglo Eastern (UK) Ltd." as "managers" for BS Sun Shipping.  Panagos Decl. Ex. L.  Captain Drummond, upon receiving the email from "M.V. Stinice," forwarded it to, inter alia, Ante Radica, who (according to Zlatko Kabic) was the president of BS Sun Shipping.  Panagos Decl. Ex. G; Kabic Depo. at 11, at Panagos Decl., Ex. F.

D.  Procedural History of Litigation

On January 4, 2005, a U.S. Virgin Islands lawyer Bruce Bennet identified himself to Citgo as a lawyer representing the "vessel owners" (without specifying, exactly, which "owners").  Panagos Decl., Ex. H at BS SUN 02063.  Citgo's counsel, after investigation, presented its cargo damage claim for $615,733.13 to Bennet by letter on March 8, 2005, and cc'd Elka and BS Sun (care of BS Sun's "Anglo-Eastern U.K." address in Glasgow).  Panagos Decl., Ex. D, ELKA000197.  On March 13, 2005, according to Pilot and

---

[12] Counsel for BS Sun and Pilot confirmed in subsequent emails to the Court that Captain Malinka was the captain of the STINICE, and a representative of BS Sun, during the voyage in question.

undisputed by the other parties, BS Sun sold the STINICE to Pilot.  Pilot Compl. ¶ 15.
On April 8, 2005, a lawyer Hugh Straub, without specifying whom he represented, wrote
Citgo counsel and asked for additional information "without prejudice to any rights to
arbitration which those interested in Stinice may have."[13]  Panagos Decl., Ex. J.

On August 9, 2005, according to Pilot and undisputed by the other parties, the
vessel's P& I underwriters issued a Letter of Undertaking promising to pay up to
$617,000 to be paid by the "owners" of STINICE to Citgo.  Pilot Compl. ¶ 16.

On November 7, 2005, Citgo avers it notified Elka and EPC of Citgo's demand
for arbitration against BS Sun, and additionally notified "Anglo-Eastern."  See Citgo
Memorandum of Law ("Citgo Mem.") at 10.[14]  On December 8, 2005, after Citgo's first
choice of arbitrator declined to serve, Citgo again demanded arbitration with BS Sun
seeking damages arising from the alleged contamination of the diesel oil.  See Wolfson.
56.1 Decl., Ex. (A)(1)(C).  Citgo also addressed its demand to Elka (specifically to
Vasilas) and to EPC at the mail, fax, and email addresses that Vasilas had listed under
"Owner's Mailing Address/Phone/Etc." on the fixture recap for the Pilot-Citgo "voyage
charter."  See id.; see also Panagos Decl., Ex. D, at ELKA 000032.

On December 27, 2005 (according to Citgo and undisputed by BS Sun), BS Sun
dissolved operations.[15]  Citgo Mem. at 9.  On December 28, 2005, to preserve its rights in
arbitration, BS Sun, through its now-current counsel, nominated an arbitrator.  See
Wolfson. 56.1 Decl., Ex. (A)(1)(D).  BS Sun did so "[w]ith full reservation of all rights of
the Owners to contest the validity of any asserted agreement to between them [sic] and
CITGO Petroleum Corporation…"  Id.

On February 2, 2006, BS Sun initiated this action against Citgo by filing its
petition to seek a declaratory judgment that no valid arbitration agreement exists between
BS Sun and Citgo, as well as a permanent stay of arbitration.

---

[13] Citgo avers, and it has not been disputed by the other parties, that Straub was acting on behalf of BS Sun.

[14] This letter does not appear to be provided in support of these motions.  Although Citgo, in its
Memorandum of Law, cites to a document "ELKA 000215" at Exhibit D of the Panagos Declaration in
support of this fact, no such document is provided.  See Citgo Mem. at 10 n.54.  That said, this fact is not
disputed by the other parties.

[15] BS Sun's counsel confirmed at oral argument that BS Sun indeed has dissolved operations (albeit without
specifying the exact date).  See Transcript of Oral Argument, June 13, 2007 ("Tr.") at 20:3-4 (BS Sun
counsel: "…BS Sun definitely did dissolve.").

On February 10, 2006, Islandia emailed Elka (including Vasilas) and stated that it was missing "owner's confirmation" of the "Administration Clause" of the charter party. Panagos Decl., Ex. D, at ELKA000225.  Elka responded on February 14, 2006 and stated that "owners agree/approve of the terms and conditions for the above reference charter party. Regards, ESBTNYC 'as agents only.'"  Id.  Vasilas testified that approval for this admission came from Pilot.  Vasilas Depo. at 48-49, at Panagos Decl. Ex. C.

On March 13, 2006, Citgo filed a motion to dismiss BS Sun's petition and to compel BS Sun to arbitration.  On August 8, 2006, after briefing by BS Sun and Citgo, I denied Citgo's motions, but ordered additional discovery as to the relationships between the parties and the circumstances of the negotiations of the "time charter" and "voyage charter."  See BS Sun Shipping Monrovia v. Citgo Petroleum Corp., 2006 U.S. Dist. LEXIS 54588, at *12-13 (S.D.N.Y. Aug. 8, 2006).

On August 30, 2006, Citgo answered BS Sun's petition and brought, in the alternative, a counterclaim for cargo damage against BS Sun under the U.S. Carriage of Goods by Sea Act ("COGSA").  See 46 U.S.C.A. Appx § 1300 et. seq. (2007).  BS Sun answered Citgo's counterclaim on September 5, 2006, and interposed as its tenth affirmative defense that Citgo's counterclaim was time-barred by the statute of limitations of COGSA.  See 46 U.S.C.A. Appx § 1303(6).

After two extensions of the discovery period, and two extensions of time to allow the parties to mediate, the parties' mediation efforts apparently failed.

On March 9, 2007, Pilot demanded arbitration with BS Sun in London.  That day, Pilot also filed a motion to intervene in this action, and requested a Rule B maritime attachment against BS Sun to secure the funds under dispute in the London arbitration. BS Sun opposed.[16]  Pilot, in its complaint, also 1) brings a separate breach of contract claim against BS Sun based on allegations that BS Sun failed to defend and indemnify Pilot against any damages claimed by Citgo; 2) seeks a declaratory judgment as to the meaning of term "owner" in the Letter of Undertaking provided by the vessel's P&I underwriters that would essentially require the vessel's P&I underwriters to indemnify Pilot for any damages it owes to Citgo; and 3) seeks a declaratory judgment that any

---

[16] Citgo also opposed, insofar as Pilot argued that Citgo's demand for arbitration against Pilot is time-barred by the statute of limitations of COGSA.

claim Citgo might bring against Pilot – whether in arbitration or in court – is time-barred by the statute of limitations of COGSA.

On April 11, 2007, Citgo renewed its motion to dismiss BS Sun's petition and compel BS Sun to arbitrate.  Concomitantly, on April 11, 2007, BS Sun cross-moved for summary judgment in support of its original petition to stay arbitration by Citgo against BS Sun.  Citgo also moved to compel Pilot to arbitrate.  Pilot subsequently opposed.

BS Sun also moved to dismiss Citgo's federal COGSA counterclaim against BS Sun as time-barred.[17]  Concomitantly, Citgo cross-moved to strike BS Sun's affirmative defense that Citgo's federal COGSA counterclaim is time-barred.[18]

## II.   STANDARD OF REVIEW

A court will not grant a motion for summary judgment unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The moving party bears the burden of demonstrating the absence of a material factual question.  Anderson v. Liberty Lobby, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202. In determining whether there is a genuine issue of material fact, the Court must resolve all ambiguities, and draw all inferences, against the moving party.  United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir. 1987). However, a disputed issue of material fact alone is insufficient to deny a motion for summary judgment; the disputed issue must be "material [*19] to the outcome of the litigation," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); see also Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992).

---

[17] Pilot joined BS Sun's motion insofar as Pilot sought a declaratory judgment that any claim Citgo might bring against Pilot – whether in arbitration or in federal court – is time-barred by the statute of limitations of COGSA.

[18] As one might infer, Citgo and BS Sun's motions are essentially the "flip side" of each other.  It is unclear why the parties found it necessary to submit two sets of briefing on these motions rather than one.

# III.   DISCUSSION

I will address the various motions and cross-motions between the parties *seriatim*.

## A.   Pilot's Motion to Intervene

At the outset, Pilot seeks to intervene in this action either as a matter of right under Fed. R. Civ. P. 24(a)(2),[19] or by permission under Fed. R. Civ. P. 24(b)(2).  Fed. R. Civ. P. 24(b)(2) provides that "[u]pon timely application anyone may be permitted to intervene in an action… when an applicant's claim or defense and the main action have a question of law or fact in common…. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."  See Fed. R. Civ. P. 24(b)(2); see also United States v. Pitney Bowes, Inc., 25 F.3d 66, 73 (2d Cir. 1994).  A district court's ruling on permissive intervention is reviewable for abuse of discretion.  See, e.g., United States v. Pitney Bowes, Inc., 25 F.3d at 69; In re Bank of N.Y. Derivative Litig., 320 F.3d 291, 299-300 (2d Cir. 2003).[20]

Pilot argues that its claims are substantially intertwined with questions of law and fact common to the claims between BS Sun and Citgo.  I agree.  I do not find, as BS Sun avers, that it is unduly prejudiced by Pilot's entry into this action, or that Pilot's application is untimely in such a way to prejudice BS Sun.[21]  If anything, Pilot's entry into this action should and does mercifully hasten the resolution of the issues between these three parties (that, regrettably, the three parties, over the course of several months, could not successfully mediate themselves).

---

[19] Fed. R. Civ. P. 24(a)(2) provides that "Upon timely application anyone shall be permitted to intervene in an action… when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

[20] "Because of the variety of factual circumstances that face a district court called upon to decide whether to grant or deny a motion to intervene, and the close proximity of that court to the case's nuances, it has the advantage of having a better 'sense' of the case than [the Circuit] do[es] on appeal."  United States v. Pitney Bowes, Inc., 25 F.3d at 69.

[21] Indeed, BS Sun's actions, including its apparent sale of the STINICE five days after receiving Citgo's damage claim, and dissolution of operations nineteen days after Citgo demanded arbitration against it, raise some inference that at least part of the delay in resolving the claims between these parties is attributable to BS Sun.  At the least, BS Sun has moved less than expeditiously to resolve the claims arising against it in its capacity as owners of the STINICE during the voyage in question.

Accordingly, I grant Pilot's motion to intervene by permission pursuant to Fed. R. Civ. P. 24(b)(2).[22]

B.  <u>Citgo's Motion to Compel Pilot to Arbitrate</u>

Citgo seeks to compel Pilot to arbitrate in New York pursuant to the Citgo-Pilot "voyage charter" contract.

Notwithstanding the strong federal policy favoring arbitration, courts must treat agreements to arbitrate like any other contract.  <u>See</u> <u>U. S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.</u>, 241 F.3d 135, 146 (2d Cir. 2001) ("<u>Titan</u>").  A contract is formed when there is a meeting of the minds of the parties on the essential terms of an agreement.  <u>Titan</u>, 241 F.3d at 146, <u>citing</u> <u>Interocean Shipping Co. v. National Shipping & Trading Corp.</u>, 523 F.2d 527, 534 (2d Cir. 1975).  A "fixture recap" is recognized throughout the shipping industry as an agreement to a charter party's essential terms.  <u>Titan</u>, 241 F.3d at 146 ("recap" constituted proof of a binding agreement or "fixture," which is "a commitment that a voyage will be performed" and concomitantly "presupposes a final contract, with main terms set, and final details to be resolved subsequently"), <u>quoting</u> <u>Great Circle Lines, Ltd. v. Matheson & Co.</u>, 681 F.2d 121, 125 (2d Cir. 1982); <u>see also</u> <u>Stolt Tankers, Inc. v. Marcus Oil & Chem.</u>, 2001 U.S. Dist. LEXIS 19750, at *4 (S.D.N.Y. 2001).

Here, it appears undisputed that the broker Chris Vasilas, on behalf of Pilot, and the Islandia brokers, on behalf of Citgo, reached an agreement on a binding "voyage charter" that contained a clause providing for arbitration in New York and then memorialized that agreement via a "fixture recap."  Indeed, Vasilas initially proposed the contract, including the arbitration clause, himself.  Vasilas did not object to the fixture recap following its circulation.[23]  All these facts support the proposition that Vasilas, acting as Pilot's broker, bound Pilot to the "voyage charter" that contained the arbitration

---

[22] BS Sun's counsel, for the first time at oral argument, raised without citing caselaw the argument that permissive intervention by Pilot here requires personal jurisdiction over BS Sun.  Leaving aside the fact that BS Sun initiated this action in this Court, because BS Sun did not raise this argument in its briefing, I will not consider it upon these motions.

[23] <u>See</u> <u>Stolt Tankers, Inc. v. Marcus Oil & Chem.</u>, 2001 U.S. Dist. LEXIS 19750, at *6 ("[Respondent] did not take advantage of several opportunities to challenge both the existence and terms of the charter party before [shipper] performed on the contract and shipped the goods. If [respondent] disagreed with the fixture recap it could have and should have objected in writing.").

clause at issue.  See Stolt Tankers, Inc. v. Marcus Oil & Chem., 2001 U.S. Dist. LEXIS 19750, at *6 (Court compelled arbitration over party's objection because party agreed to fixture recap that contained arbitration clause).

Pilot argues that although it provided its broker Vasilas with authority to negotiate a voyage charter on its behalf, it did not provide Vasilas with specific authority to negotiate the arbitration clause contained therein.  Pilot's sole evidence in support is the self-serving affidavit of Captain Karandinos, who avers that he did not provide Vasilas with such specific authority and did not discuss the issue of arbitration with Vasilas at this time.[24]  Under the Federal Arbitration Act, Pilot argues, "[i]f a party raises an issue as to the making of the agreement – by presenting 'some evidence' in support of its claim – then the court must set the issue for trial."  Ministry of Indus. & Trade v. S. Kasmas & Bros., Ltd., 2001 U.S. Dist. LEXIS 13878, at *6 (S.D.N.Y. 2001), citing Sphere Drake Ins., Ltd. v. Clarendon Nat'l Ins. Co., 263 F.3d 26, 30 (2d Cir. 2001).[25]

Citgo requests, however, that I strike Captain Karandinos' affidavit.  To meet the standards for self-authentication under Fed. R. Evid. 902(3), a foreign affidavit must generally be accompanied by a "final certification," by either an embassy or consular agent of the United States or a diplomatic or consular official of the foreign country, as to the genuineness of the signature and the official position of the attesting person.  See Fed. R. Evid. 902(3).[26]  Captain Karandinos' affidavit provides no such certification as to the

---

[24] Pilot also avers that the Citgo contract was the first contract that Vasilas had negotiated regarding the STINICE.  See Vasilas Depo. at 24:12-14, at Panagos Decl. Ex. C.  That said, Vasilas testified that he had negotiated over twenty prior fixture recaps with Citgo.  See Vasilas Depo. at 23-24.  Captain Karandinos, for his part, declared that his responsibilities included "working with brokers for the negotiation of voyage charter parties on behalf of Pilot Enterprises Inc. for the… STINICE."  Karandinos Aff. ¶ 3.  Karandinos does not specifically mention whether this was the first time he worked with Vasilas.  In any event, neither Vasilas nor Captain Karandinos appear to be "rookies" regarding the process of negotiating a charter party.

[25] Additionally, "whether founded in actual or apparent authority, the existence of a principal/agent relationship depends crucially on the words or actions of the principal."  Ferrostaal, Inc. v. M/V Sea Baisen, 2004 U.S. Dist. LEXIS 24083, at *11 (S.D.N.Y. 2004).

[26] Fed. R. Evid. 902(3), "Self-Authentication," states in relevant part: "Foreign public documents. A document purporting to be executed or attested in an official capacity by a person authorized by the laws of a foreign country to make the execution or attestation, and accompanied by a final certification as to the genuineness of the signature and official position (A) of the executing or attesting person, or (B) of any foreign official whose certificate of genuineness of signature and official position relates to the execution or attestation or is in a chain of certificates of genuineness of signature and official position relating to the execution or attestation.  A final certification may be made by a secretary of an embassy or legation, consul general, consul, vice consul, or consular agent of the United States, or a diplomatic or consular official of the foreign country assigned or accredited to the United States."

genuineness of his signature, nor his position.[27]  See Pace Shipping Servs. Network SA v.
M/V Ocean D, 2003 WL 1733542, 2003 U.S. Dist. LEXIS 5234, at *4-5 (E.D. La. 2003)
(Court declined to accept translated copies of foreign pleadings without certification by a
U.S. or foreign consular official, stating, "There is nothing that allows this Court to
determine the genuineness or certify the markings on the documents.").  Captain
Karandinos' affidavit is merely notarized by a Greek attorney without comment.  Such
notarization is insufficient to authenticate his affidavit such that it may be admitted as
evidence.  Cf. Pace Shipping Servs. Network SA v. M/V Ocean D, 2003 U.S. Dist.
LEXIS 5234, at *5 (statement by foreign lawyer which "attempt[s] to maintain the
genuineness of the pleadings… falls short of the standards for authentication").
Accordingly, I will strike Captain Karandinos' affidavit and not consider it in connection
with these motions.

Even were I to consider Captain Karandinos' affidavit, his averments – and
Pilot's arguments based upon them – strain credulity.[28]  Captain Karandinos, if he
regularly worked with ship brokers, as he avers, must have known that "voyage charter"
contracts regularly contain arbitration clauses.  Indeed, the standard "ASBATANKVOY"
charter party form that Vasilas proposed to use here contains an arbitration clause that
provides for arbitration in either London or New York at the parties' election.  Vasilas'
offer specifically contained a further clause, "GA/ARB NYK US LAW," which
testimony shows to mean that Vasilas designated New York as the place of arbitration.
Although Captain Karandinos may not have explicitly discussed with Vasilas on this
specific occasion the specific issue of an "alternative dispute resolution clause," the most
likely explanation is that Karandinos, in the normal course, granted authority to Vasilas
to negotiate a contract that both knew would contain an arbitration clause.  The
consideration of Karandinos' affidavit would not change this Court's conclusion that
Vasilas, as Pilot's broker, legally bound Pilot to the clause in the voyage charter
providing for arbitration in New York.

One last argument warrants mention.  Pilot avers that technically, Citgo has yet to
demand arbitration against it, as Citgo's operative demand for arbitration of Dec. 8, 2005

---

[27] Indeed, Pilot has provided only a copy of Karandinos' affidavit, without an original signature.

[28] See Tr. at 5:22-25 (Court: "[T]his captain wrote what I considered to be one of the cleverest self-serving
affidavits I've seen in a long time."  Pilot counsel: "Thank you, Your Honor.").

is addressed to Elka, EPC, and BS Sun, but not Pilot.  However, when Citgo made its demand for arbitration under the voyage charter against the "owners," Citgo followed its eminently reasonable interpretation of the voyage charter that the demand against Pilot (if Pilot was indeed an "owner," which only became clear later) should be addressed to Elka and EPC.  The voyage charter lists, under "Owner's Mailing Address/Phone/Etc.," Elka and EPC as the points of contact for the "owners."  Indeed, Vasilas confirmed that a) Pilot was a "disponent owner," b) Elka was acting as Pilot's agent, and c) that the section of the voyage charter listing the "owner's mailing address" was intended to provide Citgo with its means of contacting the owners should a dispute arise.  See Vasilas Depo. at 29, at Panagos Decl. Ex. C ("This is for notice… if there's an issue during the charter so that they have some contact details to get in touch with you.")[29]  Pilot cannot evade arbitration merely because Citgo essentially followed Pilot's broker's instructions not to name Pilot when Citgo made its demand.[30]

For the foregoing reasons, Citgo's motion to compel Pilot to arbitrate in New York is granted.[31]

### C.   Citgo's Motion to Compel BS Sun to Arbitrate

Citgo renews its motion to compel BS Sun to arbitrate in New York, pursuant to the arbitration clause in the Citgo-Pilot "voyage charter."  I will address Citgo's arguments in roughly decreasing order of strength.

First, Citgo argues that BS Sun was a party to the "voyage charter," and thus the arbitration clause therein.  Although BS Sun's name is admittedly on the "voyage

---

[29] Additionally, Pilot has not disputed Citgo's contention that EPC was Pilot's "alter ego."

[30] See also Texas Am. Shipping v. Intermarine Fin. Corp., 1994 U.S. Dist. LEXIS 9414, at *7 (S.D.N.Y. 1994) ("where a party has agreed to arbitrate, the Court will compel arbitration, notwithstanding technically defective service, so long as the party has had actual notice of the petition to compel arbitration.").

[31] As noted above, Pilot also opposed Citgo's motion to compel arbitration in part on the grounds that Citgo's claims in arbitration against Pilot would be barred by the one-year statute of limitations of COGSA. Pilot's argument is unavailing.  Citgo's claims in arbitration are likely not time-barred by COGSA – but in any event, that determination is for the arbitrator, not for this Court.  See Office of Supply v. New York Navigation Co., 469 F.2d 377, 380 (2d Cir. 1972) ("[W]here parties have agreed to settle differences by arbitration, they should not be denied access to that forum, regardless of COGSA's one-year time-bar, provided they invoke arbitration within a reasonable time after their differences have arisen.  Thereafter it is for the arbitrators, not the court, to decide whether a claim is time-barred by their agreement.") (internal citation omitted), citing Son Shipping Co. v. DeFosse & Tanghe, 199 F.2d 687, 689 (2d Cir. 1952). Concomitantly, to the extent that Pilot's fourth cause of action in its Complaint seeks to stay arbitration by Citgo against Pilot owing to the COGSA time-bar, such requested relief is denied.

charter" contract, it appears undisputed after discovery that Pilot's broker Vasilas mistakenly put BS Sun's name on the "voyage charter" even though Vasilas neither represented BS Sun nor discussed the issue with BS Sun at the time.  Although a "fixture recap" is a binding contract, there still must exist a "meeting of the minds" to bind the parties.  See Cross Chartering N.V. v. R.I.P.C. (Trinidad) Ltd., 2005 U.S. Dist. LEXIS 27499, at *37 (S.D. Tex. 2005) (Court held that where fixture recap was neither "presented to, received by, signed, or in any way agreed to" by cargo owners, cargo owners were not bound by fixture recap agreed to between charterers).  It is clear that BS Sun never intended to be bound by the Pilot-Citgo contract, nor its arbitration clause – only the BS Sun-Pilot "time charter."  Cf. Asoma Corp. v. SK Shipping Co., 467 F.3d 817, 827 (2d Cir. 2006) (Court held that time-charter parties "were not parties to the [voyage] charter party. Its terms, including its forum selection clause, were not applicable to a dispute between them and [the purchaser of goods under the voyage charter].").  Citgo's argument on this score fails.

Secondly, though, even if BS Sun is not a party to the Citgo-Pilot "voyage charter," some courts have held that broad arbitration clauses cover disputes involving non-signatories to that clause.  See Thyssen, Inc. v. M/V Markos N, 1999 U.S. Dist. LEXIS 12578, at *12-13 (S.D.N.Y. 1999) (Mukasey, J.) ("Thyssen") ("[A] 'broad' arbitration clause governing 'all disputes' arising under the charter covers even a dispute involving a nonsignatory.  By contrast, courts have held that a 'narrow' arbitration clause, which typically provides that 'disputes between owners and charterers' must be arbitrated, applies only to disputes between the particular parties identified in the clause.") (internal citations omitted).  The arbitration clause in the Citgo-Pilot "voyage charter" here – i.e., "GA/ARB NYK US LAW," – that provides for "general average" arbitration in New York without other limitation appears to be such a "broad" arbitration clause.

However, Judge Mukasey noted that a different situation arose where a shipowner charters a vessel, and the vessel is subsequently subchartered.  There, Judge Mukasey held that the shipowner has no rights to invoke the arbitration clause of the subcharter, as "the shipowner is not a party to the subcharter."  Thyssen, 1999 U.S. Dist. LEXIS 12578,

at *16.[32]  Conversely, then, the subcharterer (here, Citgo or Pilot) has no rights to invoke the subcharter's arbitration clause against the shipowner (here, BS Sun).  Citgo's argument to compel BS Sun to arbitrate on these grounds fails as well.

Third, Citgo argues that BS Sun "ratified" the Pilot-Citgo "voyage charter" and should thus be held to its terms, which include the arbitration clause.  "Ratification is the affirmance by a party of a prior act that did not bind it at the time but that was done or purportedly done on its account."  Chemical Bank v. Affiliated FM Ins. Co., 169 F.3d 121, 128 (2d Cir. 1999).  Citgo argues that BS Sun "ratified" the Pilot-Citgo contract when it sailed with Citgo's cargo.  That said, ratification "must be performed with full knowledge of the material facts relating to the transaction."  Id.[33]  There is no evidence that BS Sun had full knowledge of the terms of the Pilot-Citgo "voyage charter" contract, let alone the arbitration clause contained therein, at the time that BS Sun sailed the STINICE under the terms of the separate BS Sun-Pilot "time charter."  Citgo's argument to compel BS Sun to arbitrate on these grounds fails as well.

Fourth, Citgo argues that BS Sun "assumed" the arbitration clause in the Pilot-Citgo "voyage charter" because it appointed an arbitrator.  "[A] party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate."  Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 777 (2d Cir. 1995).  However, BS Sun specifically reserved its rights to challenge the validity of the arbitration when it appointed its arbitrator.  See Wolfson. 56.1 Decl., Ex. (A)(1)(D). BS Sun then petitioned to stay the arbitration in this Court.  Such actions render unavailing Citgo's "assumption" argument.  See Thomson-CSF, S.A. v. American

---

[32] It bears noting that the Thyssen Court also based its holding that the nonsignatory was bound to the arbitration clause on the fact that the nonsignatory, a purchaser of goods, was issued bills of lading that explicitly incorporated the arbitration clause of the charter party at issue.  See, e.g., Thyssen at *18 ("…[H]ere, none of the parties signed the charter party. This distinction is immaterial, however, as both parties are contractually tied to the bills of lading and are bound by its terms.").  Because the Thyssen shipowner directed the time charterer to sign the bills of lading on behalf of the ship's master, the shipowner was also bound by the terms of the bills of lading, including the arbitration clause incorporated therein, and "liable in personam and the vessel liable in rem for any failure in the performance of the contract of carriage the bills evidenced."  Id.

Here, although the bills of lading are signed by the STINICE's Master Roberto Malinka, a representative of the ship's owner BS Sun, the bills of lading make no reference to any arbitration clause, nor to the "voyage charter" generally.  Accordingly, unlike the situation in Thyssen, the bills of lading themselves do not bind BS Sun to the arbitration clause in the Citgo-Pilot voyage charter.

[33] "The assent must be clearly established and may not be inferred from doubtful or equivocal acts or language."  Chemical Bank v. Affiliated FM Ins. Co., 169 F.3d at 128.

Arbitration Ass'n, 64 F.3d at 777 (because party explicitly disavowed arbitral obligations and filed an action to stay arbitration, party did not "manifest an intention to be bound" by arbitration).[34]

Fifth, and finally, Citgo argues BS Sun is equitably "estopped" from denying its arbitral obligations under the Pilot-Citgo "voyage charter" because it received a "direct benefit" from the contract.  See Deloitte Noraudit A/S v. Deloitte Haskins & Sells, 9 F.3d 1060, 1064 (2d Cir. 1993) (party estopped from denying arbitration clause of contract where it received agreement signed by its umbrella organization, failed to object, and subsequently used trademark provided for in agreement).  Here, however, unlike the Deloitte case, there is no evidence that BS Sun received the Pilot-Citgo "voyage charter" contract until before the voyage.[35]  To equitably estop BS Sun, BS Sun must "knowingly accept" the benefits of the Pilot-Citgo agreement, a finding unsupported by the evidence here.  See MAG Portfolio Consult, GmbH v. Merlin Biomed Group, LLC, 268 F.3d 58, 61 (2d Cir. 2001), citing Deloitte Noraudit A/S v. Deloitte Haskins & Sells, 9 F.3d at 1064.  Additionally, whereas courts typically find estoppel based upon a "direct" benefit to the estopped party, BS Sun's benefit from the Pilot-Citgo contract is more "indirect."[36] See MAG Portfolio Consult, GmbH v. Merlin Biomed Group, LLC, 268 F.3d at 61 ("The benefits must be direct – which is to say, flowing directly from the agreement."), citing Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d at 779.  Citgo's argument to compel BS Sun to arbitrate on these grounds fails as well.

---

[34] See also Herman Miller, Inc. v. Worth Capital, 1998 U.S. Dist. LEXIS 5557, at *8 (S.D.N.Y. 1998) ("Federal courts have found that certain forms of participation waive rights or otherwise prevent parties from contesting the jurisdiction of an arbitrator to hear a dispute.  However, no federal court has found a waiver when the arbitration has not yet occurred.") (internal citations and parentheticals omitted).

[35] It does appear, as Citgo points out, that at least one BS Sun representative was put on notice of the cargo damage shortly after it occurred.  Panagos Decl. Ex. G.  That said, there is no evidence that BS Sun representatives were provided with the Pilot-Citgo "voyage charter" in advance of the voyage, such that one might conclude that BS Sun sailed the STINICE with full knowledge of the Pilot-Citgo contract (and the arbitration clause therein) and subsequently reaped the benefits thereof.

[36] As BS Sun counsel notes, when Pilot chartered the STINICE, under the terms of the "time charter," BS Sun was paid a flat rate by Pilot unless Pilot earned more than a certain amount of money by carrying cargo (for entities such as Citgo), in which case Pilot would split those monies with BS Sun.  See Wolfson 56.1 Decl. Ex. A(2) (time charter contract).  It does not appear on the evidence before me that Pilot's voyage charter with Citgo enabled BS Sun to reap additional profits.  In any event, such profits would be due more directly to the time charter with Pilot, which BS Sun was aware of, than to the voyage charter with Citgo, which BS Sun was (on the evidence before me) not aware of prior to voyage.

In sum, Citgo having failed to raise a genuine issue of material fact to rebut the finding that BS Sun is not bound to the arbitration clause in the Pilot-Citgo "voyage charter" contract, Citgo's motion to compel BS Sun to arbitrate is denied (and conversely, BS Sun's petition to stay arbitration by Citgo is granted).

   D.   <u>BS Sun's Motion to Dismiss Citgo's Federal Counter-Claim as Time-Barred</u>

   Citgo, if it cannot compel BS Sun to arbitrate in New York, brings in the alternative a counterclaim for the damage to its cargo under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.A. Appx § 1300 *et. seq.*  BS Sun counters that Citgo's claim is time-barred.[37]

   The statute of limitations under COGSA is one year.  <u>See</u>, <u>e.g.</u>, <u>Madu v. Kerr S.S. Co</u>., 1995 U.S. Dist. LEXIS 7268, at *4 (S.D.N.Y. 1995) ("Under section 1303(6) of COGSA, the applicable statute of limitations for commencement of such lawsuits is one year 'after delivery of the goods or the date when the goods should have been delivered.'"), <u>citing</u> <u>Mikinberg v. Baltic S.S. Co</u>, 988 F.2d 327, 330 (2d Cir. 1993); <u>see generally</u> 129 A.L.R. Fed. 273.  A demand for arbitration generally does not toll the statute of limitations.  <u>See</u> <u>Securitas Bremer Allgemeine Verischerungs v. M/V Aurora</u>, 1990 U.S. Dist. LEXIS 4669, at *11-12 (S.D.N.Y. 1990).

   Here, the cargo was delivered on December 20, 2004.  The one-year statute of limitations thus expired on December 20, 2005.  Although Citgo demanded arbitration in November 2005, it is undisputed that it did not bring its federal COGSA counterclaim until August 30, 2006, long past the one-year statute of limitations.

   Citgo's only hope to avoid the time bar is that BS Sun is equitably estopped by its actions from asserting the time-bar.  "[A] plaintiff may... defeat an otherwise applicable time-bar defense by showing that the defendant either agreed to waive the defense or else misled the plaintiff into justifiably believing that the limitations period would be extended."  <u>Madu v. Kerr S.S. Co</u>., 1995 U.S. Dist. LEXIS 7268, at *5-6, <u>citing</u> <u>Mikinberg v. Baltic S.S. Co</u>, 988 F.2d at 331.  Here, Citgo presented its claim to what it thought was BS Sun's lawyer on March 8, 2005.  On April 8, 2005, a different lawyer

---

[37] Pilot, in its Complaint, also appears to seek a declaratory judgment that any COGSA counterclaim that Citgo might bring against Pilot is time-barred.  <u>See</u> Pilot Compl. ¶ 50 ("Any and all proceedings Citgo may seek to commence as against Pilot are strictly time-barred.").

asked for more information "without prejudice to any rights in arbitration." On November 7, 2005, and again on December 8, 2005, Citgo demanded arbitration against BS Sun. BS Sun did not respond until December 28, 2005, at which point it appointed an arbitrator (while still reserving its rights). At no point did anyone on behalf of BS Sun discuss, let alone imply that they would agree to waive, the COGSA time-bar.

Citgo attempts to characterize BS Sun's inaction in responding to Citgo's demand for arbitration as the type of affirmative misrepresentation that "misled" Citgo into believing that the limitations period would be extended. Inaction, however, does not serve to toll the statute of limitations. See Securitas Bremer Allgemeine Verischerungs v. M/V Aurora, 1990 U.S. Dist. LEXIS 4669, at *9 (Court declined to find equitable estoppel because "defendant made no agreement waiving the limitations period, upon which plaintiff justifiably relied").[38] Nor does BS Sun's appointment of an arbitrator (while reserving its rights to challenge the arbitrator's jurisdiction, no less) estop BS Sun from asserting the time bar. See id. at *10-11 (notwithstanding that defendant appointed arbitrator and reserved its rights, "a party to a contract is [not] under an affirmative obligation to advise its adversary of a procedural error in bringing a claim.").

Although BS Sun undoubtedly could have been more forthcoming and proactive in responding to Citgo's demands, such proactivity is not required by law under COGSA. Citgo's proper recourse was simply to bring a COGSA claim against BS Sun before that one-year statute of limitations passed.

Accordingly, BS Sun's motion to dismiss Citgo's counterclaim against BS Sun is granted, and conversely, Citgo's cross-motion to strike BS Sun's affirmative defense is denied.[39]

### E.   Pilot's Remaining Causes of Action

In accordance with the foregoing, Citgo will proceed in arbitration against Pilot in New York pursuant to their contract, and Pilot will proceed in arbitration against BS Sun in London pursuant to their contract. As BS Sun's petition to stay arbitration against

---

[38] See also Mikinberg v. Baltic S.S. Co., 988 F.2d at 331 ("[Plaintiff] would have to show that [Defendant] falsely represented to him that the statute would be extended during the investigation into the stolen cargo, or that [Defendant] would not assert the statute as a defense.")

[39] To the extent that Pilot seeks in its complaint a declaratory judgment that Citgo is precluded from bringing a federal COGSA counterclaim in this action against Pilot, such relief is granted. The granting of such relief, however, has no application to Citgo's arbitration against Pilot. See note 31, supra.

Citgo is granted, and Citgo's COGSA counterclaim against BS Sun is dismissed, there appears to be no genuine dispute left in this action as between BS Sun and Citgo.[40]

Pilot's Complaint having now been accepted, its remaining causes of action are 1) a claim to secure attachment of BS Sun's property pending their London arbitration, 2) a breach of contract claim against BS Sun based on BS Sun's alleged failure to defend and indemnify Pilot for damages claimed by Citgo, and 3) a claim for declaratory judgment as to the meaning of term "owner" in the Letter of Undertaking provided by the vessel's P&I underwriters that would essentially require the vessel's P&I underwriters to indemnify Pilot for any damages Pilot owes to Citgo.[41]

Regarding Pilot's claim to secure attachment of BS Sun's property, BS Sun argues that Pilot's claim for attachment rests on an indemnity claim that is not yet ripe, as Citgo has not yet proceeded in arbitration and won damages against Pilot. See T&O Shipping v. Lydia Mar Shipping Co. S.A., 415 F. Supp. 2d 310, 316 (S.D.N.Y. 2006) (vacating attachment based on maritime claim for indemnity where claims against purported indemnitee were yet to be resolved).[42]  Pilot avers that its claims against BS Sun (in the arbitration and in this Court) rest on broader grounds than indemnity alone, and moreover, that Pilot faces a danger that if Citgo recovers against Pilot, Pilot might be left "holding the bag," as BS Sun has dissolved.  Accordingly, Pilot shall, within a week of the date of this order, submit a letter-brief of no more than four pages in support of its application for an attachment.  BS Sun, if it so chooses, shall oppose within three days of Pilot's submission.  I will hold Pilot's application for an attachment *sub judice* until then.

Regarding Pilot's claim for breach of contract against BS Sun, and for a declaratory judgment regarding the Letter of Undertaking provided by the vessel's P&I underwriters, those claims will proceed in their ordinary course.[43]  A pre-trial scheduling

---

[40] Nor between Citgo and Pilot.  See note 41, infra.

[41] Regarding Pilot's fourth cause of action, as previously noted, Pilot's request to stay arbitration by Citgo against it based on the COGSA time-bar is denied, while Pilot's request for a declaratory judgment that Citgo may not bring a COGSA claim against it in this action is granted.  It appears that there is no remaining relief that Pilot seeks under this cause of action.  Unless Pilot counsel writes this Court to the contrary within a week of the date of this Order, Pilot's fourth cause of action will accordingly be dismissed, and Citgo will be dismissed from this action (unless Citgo writes to the contrary).

[42] But see Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 446, 446 n.8 (2d Cir. 2006) (calling into question the test for vacatur of attachment used by the T&O Shipping Court).

[43] BS Sun avers that as the BS Sun-Pilot time charter provides for English jurisdiction over disputes arising thereunder, and that the time charter contains an arbitration clause, Pilot's claims against BS Sun are

conference will be held in Chambers at 4:30 P.M. on Thursday, October 4, 2007. Pilot shall notify the P&I underwriters promptly of the issuance of this opinion, in case those underwriters seek to be represented before this Court.

## IV. CONCLUSION

The instant motions are resolved in accordance with the foregoing reasoning. It warrants mention that the clients and this Court would have been better served had these three parties resolved their claims against one another in one venue (most preferably, arbitration either in London or New York). This Court expresses some frustration with counsel and concern for their clients (and if they don't care, at least their shareholders) that such a result was not reached, especially here, where it is my guess that without further litigation the sum of money at issue has already been dissipated in fees of one sort or another. That said, this is the result that I am compelled by law to reach.

**SO ORDERED.**
**September __, 2007**
**New York, New York**

_____
U.S.D.J.

---

subject to mandatory arbitration in London. Nothing prevents BS Sun from bringing a motion to dismiss based on those arguments.

21